UNITED AIRCRAFT CORPORATION *v.*
DENNIS P. O'CONNOR, TAX COMMISSIONER

SUPERIOR COURT          HARTFORD COUNTY          FILE No. 88398

Memorandum filed May 4, 1953.

*Shipman & Goodwin,* of Hartford, for the Plaintiff.

*George C. Conway,* Attorney General, *William L. Beers* and *Walter T. Faulkner,* Assistant Attorneys General, of Hartford, for the Defendant.

ALCORN, J. The plaintiff appeals from the defendant's assessment of a sales and use tax deficiency in the amount of $61,558.75, with interest amounting to $10,084.55, for the period from July 1, 1947, to March 31, 1948. The original assessment was made in October, 1950, on personal property valued at $2,051,958.29 purchased by the plaintiff in connection with its performance of contracts with the United States for the navy and army air force.

The plaintiff claims that the property is not subject to the tax because it was purchased for resale, and that it was stored, used or consumed in this state with respect to sales of tangible personal property to the United States. The defendant claims that the property is taxable because it was not purchased for resale, but rather for experimental and research work under contracts primarily designed to obtain the technical engineering skill of plaintiff's professional staff.

By written stipulation on file and further stipulations during the trial, certain disputed items have been agreed upon. Transactions involving eight lengthy contracts remain in dispute. No two contracts are in identical terms. The contract, exhibit A, required the plaintiff to "furnish and deliver" eight experimental aircraft engines with numerical parts lists, assembly specifications, and negative or blueprints of original experimental drawings for each at a unit price of $187,000, the total contract

price being $1,496,000. The contract provided for partial payments and that when such were made, "title to all parts, materials, inventories, work in process, and non-durable tools therefore acquired or produced" should vest in the government, and that "[u]pon liquidation of all partial payments hereunder or upon completion of deliveries called for by this contract, title to all property (or the proceeds thereof) which has not been delivered to and accepted by the Government under this contract or which has not been incorporated in supplies delivered to and accepted by the Government under this contract and to which title has vested in the Government under this Article shall vest in the Contractor." Exhibit A, article 14 (b) and (d). The engines were delivered and accepted F.O.B. East Hartford and the contract price was paid in full.

The contract, exhibit C, required the plaintiff to "furnish and deliver" one full-scale mock-up of an engine complete with mounts and other equipment, three experimental engines, three triplicate test reports, monthly progress reports, and the development of fuel injection and ignition systems for the engines. The contract price was $5,000,000. Provision as to payments and title (article 41 (b) and (d) ) are included like those quoted above from exhibit A. The engines and other items contracted for were delivered and were paid for in full.

The contract, exhibit I, required the plaintiff to develop an engine model and "furnish" four engines of that model, with accompanying test and progress reports, at a price of $300,000 each for a total contract amount of $1,200,000. The engines were delivered and the contract price was fully paid.

The contract, exhibit G, required the plaintiff to complete a 150-hour qualification test on a govern-

ment furnished engine "including design and construction of all new parts and all replacements and repairs of parts," to establish a special carburetor setting for the engine, and render final reports for a total contract price of $157,000. For this purpose, the government undertook to furnish three engines for the plaintiff's use, title being retained by the government and the plaintiff undertaking to dispose of the engines as directed by the government at the end of the tests. The operation involved the conversion of the furnished engine into one of a new type by the furnishing and installation of approximately 15 per cent of new parts. The contract was completed, the engine delivered to the government on completion, and the price was paid in full.

The contract, exhibit H, required the plaintiff to convert three engines owned and furnished by the government into engines of a new type and furnish various reports. The operation involved furnishing and installing about 25 per cent of new parts and on completion the engines were delivered as directed by the government. The engines belonged to the government at all times. The contract price of $5,505,000 was paid in full. The contract contained provisions as to partial payment and title as quoted in exhibit A above. (article 42 (b) and (d) ).

The contract, exhibit D, after reciting extensive experiments previously conducted by the plaintiff which the government considered worthy of continuance, requires the plaintiff to design, develop and demonstrate the components of a gas turbine aircraft engine. The total contract price of $3,182,757 is allocated among a single unit gas generator, a multi-stage gas turbine, a supplemental combustion chamber, a propeller drive turbine reduction gear, a turbine discharge duct and altitude propulsion jet and a multi-unit gas generator as-

sembly. The contract price of each item includes experimentation, reports, design and drawings, and construction. The contract provided for delivery at the option of an agency of the government. All of the work was completed but the government exercised its option to take delivery only as to the combustion chamber. In this contract, contrary to those preceding, separate prices were fixed for development, reports, design, and manufacture.

The contract, exhibit E as amended by exhibits E1 and E2, is similar in form to exhibit D, just discussed. For a total price of $3,331,320 broken into component units, the plaintiff undertook in exhibit E the design of a gas turbine, a propeller drive and reduction gear, an axial flow compressor, a combustion chamber, a multi-stage gas turbine, a power plant inlet and exhaust pipe, together with reports and construction. Exhibits E1 and E2 provide for additional components at additional prices of $825,000 and $2,400,000 respectively. The items called for in the contract as amended were manufactured but no tangible property was delivered to the government since the latter did not exercise its option to take delivery.

The final contract so-called, exhibit F1, is not a contract in the sense of the others discussed above. It is rather a document indicative of the navy's intent to enter into a contract with the plaintiff to modify a production contract for aircraft engines, exhibit F, then in existence. It, in substance, authorized plaintiff to purchase materials and make commitments in anticipation of a formal contract to be made, upon assurances of ultimate payment for such costs as were incurred, with a reasonable profit, prior to execution of a formal contract. No formal contract followed exhibit F1, and the plaintiff's costs were computed for payment by the government. The original contract (exhibit F)

concerned a basic design. The contract anticipated by exhibit F1, concerned an accessory to the basic design in the form of a gear box for two generators. This was never installed.

All of the contracts in issue were for experimental work as distinguished from production. The plaintiff, through its Pratt and Whitney division, in addition to its standard production of aircraft engines, maintains research engineers engaged in the constant improvement of design and construction. It uniformly pays the sales and use tax on materials consumed in its own research. For accounting purposes it classifies the sales of research results as "engineering sales" to distinguish them from "production sales" of standard engines and parts. Its research staff is also available to customers such as the government in this case, for experimental work.

The expense of experimental work far exceeds that of normal production. In the case of government contracts such as those involved here, time is of the essence. As the work progresses changes in design are frequent due to the rapid advances in aircraft engineering. The finest materials available are used. Materials which meet preliminary tests may, in the fabrication process, be found to have hidden defects requiring that they be discarded. Known weak spots in design may require provision to be made for alternatives in order that the whole project may not be delayed. Special tooling may be required or, on the other hand, operations with standard tooling to produce a special result may be required.

The result is that the plaintiff, in order to meet government needs with a minimum of delay or interruption, must acquire the necessary materials to allow for the discarding of the unfit, and the employment of the fit to complete essential work on

schedule. Work may be done and then discarded or modified due to the rapid advance of technical knowledge. Consequently materials, though purchased originally for use in a particular project, may not find their way into a finished item of tangible personal property.

The plaintiff does not purchase materials in anticipation of contracts which are only possibilities. Purchases are made only for the needs of specific contracts. They are made, however, with the knowledge that some materials will, for the reasons stated, not become a part of a finished product. They are, at the time of purchase, essential to the expeditious performance of that contract. It then is known, however, that for the reasons already described, not all will go into a finished product.

The materials purchased for the completion of the contracts in issue fall into two classes: (1) those necessary to the production but not forming any part of a finished product such as special tooling, gauges, testing material, etc., and (2) those expected to be incorporated in the finished product. The material purchased for a given contract is segregated for use in that project. After the contract is completed the material of the first class has no further utility and is scrapped. Some of the material of the second group is used in fabricating a finished engine or part which the particular contract calls for, some may not be needed and becomes surplus, and some is found defective. Defective material is scrapped. Surplus material, if usable for some other purpose may be so used, but, if not, is scrapped. Changes in design during the work may require the discarding of material in one or the other of these ways. An experimental engine is designed, built and tested; it fails to perform properly; it is torn down, parts are discarded, new ones are added. Such procedure may happen more

than once in a given experimental contract. In final result the product may not be a success and the whole may be discarded. On the other hand, an engine or part may be a success and yet be turned back to plaintiff under a new contract for further development. The material used in all such situations, however, was bought and paid for by plaintiff for the particular contract involved. The question as to whether or not it is subject to a sales and use tax becomes a question as to whether all property so purchased is exempt when a contract with the United States is involved or whether only that part which goes into the manufacture of tangible property for actual delivery to the government is exempt. Counsel state that no precedent exists on the precise question.

The ratio between the value of the technical skill and research involved in the contracts and the incidental materials is reflected in the fact that the total contract prices of the eight contracts in dispute, as described above, exceeds $23,000,000 while the property referable to them on which the deficiency is assessed totals $1,751,264.86. This last figure represents the value of property purchased by the plaintiff for the contracts under the circumstances already related. The value of the property which actually was incorporated in tangible personal property delivered to the government is not disclosed by the evidence. The plaintiff claims that it is impossible to show this figure.

If the figure cannot be proved it seems to the court that the situation is due to the methods of accounting presently in use rather than to any impossibility inherent in the process. In fact, the contracts themselves seem to contemplate that the plaintiff shall keep a record of materials actually incorporated in finished articles. In the absence of such a record it is difficult to see how the plaintiff

could, after completion of contracts such as exhibits A, C and H, assert its "title to all property (or the proceeds thereof) which has not been delivered to and accepted by the Government under this contract or which has not been incorporated in supplies delivered to and accepted by the Government" as those contracts permit it to do. The contract, exhibit H, alone involves $1,344,364.41 of the total deficiency valuation here in issue. The plaintiff, as already stated, allocates and segregates the property specifically acquired for each contract at the time of purchase. Its use for that purpose is thereafter stringently regulated. It should be no insuperable task to take the further step of recording that which was actually used in the fabrication process.

For the taxing period here involved the applicable statute then in force was chapter 78a, 1947 Supplement to the General Statutes. Under § 330i (2) and § 333i of that chapter the burden of either a sales or use tax was placed upon the plaintiff at the time it purchased the material incident to these contracts. *Alabama* v. *King & Boozer,* 314 U.S. 1, 12. The plaintiff, in making the purchases, did not pay the tax because it furnished the seller a resale certificate as provided in § 332i. The propriety of that procedure is not questioned. The effect of the certificate was merely to relieve the seller of the burden otherwise imposed on him of proving that the sale to the plaintiff was not a sale at retail (§ 332i (2) ) or that it was not a sale for storage, use or other consumption in this state (§ 333i (10) ). A "sale at retail" is defined as "a sale for any purpose other than resale in the regular course of business of tangible personal property." (§ 329i (3½) ). "Storage" is defined as "any keeping or retention in this state for any purpose except sale in the regular course of business." § 329i (4). "Use" is

defined as "the exercise of any right or power over tangible personal property incident to the ownership of that property, except that it does not include the sale of that property in the regular course of business." § 329i (5).

Thereupon the burden fell upon the plaintiff to make no use of the property "other than retention, demonstration or display while holding it for sale in the regular course of business" otherwise "the use shall be deemed a retail sale by the purchaser as of the time the property is first used by him." § 332i (4). See also § 333i (12). The same sections make the sale or use presumptively subject to tax. In the event of a keeping or retention of the property, or the exercise of any right or power over it except for sale in the regular course of business, the obligation to pay the tax is on the plaintiff. In the event of a resale, however, the plaintiff would be required by the statute to collect the tax from the purchaser unless the transaction were in an exempted class. The exemption claimed here is "the sale of and the storage, use, or other consumption in this state with respect to . . . . Sales of tangible personal property to the United States . . . or its . . . agencies." § 334i (a). The express mention in a statute of one exemption precludes reading others into it. The court is "confined to the intention which is expressed in the words [the legislature] has used." *Connecticut Light & Power Co.* v. *Walsh*, 134 Conn. 295, 301.

Section 329i (3) so far as material defines a "sale" as (a) "[a]ny transfer of title, exchange, barter, conditional or otherwise, in any manner or any means whatsoever, of tangible personal property for a consideration;" (c) "[t]he producing, fabricating, [or] processing . . . of tangible personal property for a consideration for consumers who furnish either directly or indirectly the materials

used in the producing, fabricating, processing . . .;" (g) "[a] transfer for a consideration of the title of tangible personal property which has been produced, [or] fabricated . . . to the special order of the customer . . . ."

The plaintiff argues that at the time it purchased the material and gave the resale certificates all of the material was intended for resale to the government, because, owing to the nature of the work described above, it was impossible then to determine that it would not be used in manufacturing. While this was true at least as to the property intended for use in a finished product, it was also true that in the normal course of events only a part would actually be resold as a part of a finished product. The statute provides for the contingency that property originally purchased for resale may be subsequently otherwise used or consumed. §§ 332i (4), 333i (12). To be entitled to the exemption sought, therefore, it is the plaintiff's burden to prove the resale.

The plaintiff, in claiming relief from a tax on all of the property acquired in connection with these contracts, however used, is asserting an exemption from both the sales and use tax. The plaintiff itself is not in an exempt status, and nothing in the statute purports to treat the plaintiff, as a purchaser, any differently than any other. It is only when the plaintiff, through a resale, becomes a seller that any exemption comes into play—and then only if it establishes "sales of tangible personal property to the United States."

By the terms of the contracts, exhibits A, C, and I, tangible personal property was manufactured and delivered to the government. Under the contracts, exhibits G and H, the plaintiff did work on materials furnished by the government and fabricated and added or substituted new parts. In each

case there was a sale within the meaning of the statute. *Bigsby* v. *Johnson,* 18 Cal. 2d 860. The ratio between the contract price and the tangible property actually sold is immaterial.

Except for the state of the proof in this case it would be necessary to decide whether the plaintiff would, in such a sale, be relieved of the tax upon the value of the materials which were consumed in fabricating the tangible personal property sold. That, under the language of the statute, would involve a decision as to whether or not such a use was for "other than retention, demonstration, or display while holding it for sale in the regular course of business."

By an amendment to the statute not applicable to the taxing period here in issue "production materials" described as those "which become an ingredient or component part of tangible personal property to be sold or which are consumed and used directly ... in an industrial plant in the process of the manufacture of tangible personal property to be sold" are now exempt from the tax. § 2096 (r), General Statutes. This statute is in substance similar to an administrative regulation previously adopted and followed by the tax commissioner in administering the 1947 statute at the time with which we are concerned in this case. Conn. Dept. Regs. § 104-5.

It is not necessary to decide as to the validity and effect of that administrative regulation, nor to decide whether the language of the 1947 statute would exempt such "production materials" because the proof offered does not attempt to establish what of the property in issue became such production materials in the property sold to the government. Certainly the statute could not be construed to exempt more than property now called "production materials." If it could be construed to exempt prop-

erty in the nature of "production materials" as now defined by statute and as formerly interpreted by administrative regulation, the exemption could not be claimed on all materials purchased upon proof that they were originally purchased for the work but that in performance an undisclosed part of them went into the final product sold while another undisclosed portion was unused and was scrapped or perhaps even used eventually in other work. Such is the nature of the proof in this case. In none of these contracts is it possible to determine the value of the property incorporated or consumed in manufacturing the tangible property sold to the government.

The contracts exhibit D and exhibit E with the amendments E1 and E2 the plaintiff itself describes as contracts "for an option to buy a specific item of personal property." This is a more accurate description of the transactions there involved than to call them sales. The government exercised its option to buy a single item under exhibit D but in that case also the proof is defective as in the case of the other personal property sold. The so-called "letter of intent," exhibit F1, accomplished no more than reimbursement to the plaintiff by the government for its costs incurred in anticipation of a contract which never materialized. These contracts did not amount to sales within the meaning of the statute.

It follows that the plaintiff has failed to prove the claimed exemption and that the assessment made must be held to be valid.

Enter judgment dismissing the appeal.